| 93 | 599 |
|----|-----|
| 97 | 621 |
| 93 | 599 |
| 99 | 567 |
| 93 | 599 |
| 108 | 628 |
| 93 | 599 |
| 116 | 160 |

# Terry *v.* Birmingham National Bank.

*Action on Promissory Note, by Payee against Maker.*

1. *Consideration of note.*—In an action on a promissory note payable to the order of the cashier of the plaintiff bank, which was discounted by the bank for the benefit of the maker, and the proceeds applied to the purchase in his name of certain shares of stock in a private corporation of which the bank president was the secretary, a plea setting up want or failure of consideration is without merit, although the maker testifies, without contradiction, that the transaction between him and the bank president was a conditional purchase of the stock, giving him the option to keep or return it at the expiration of ninety days, and that he gave notice of his refusal to take it before the expiration of that time; the evidence showing, also, that the note had been renewed several times, after the maker had become a director of the bank, and with full knowledge of all the facts.

2. *Unauthorized sale of shares of stock by pledgee.*—A sale of shares of stock pledged as collateral security, without notice to the pledgor, is not a conversion, when it appears that the stock was knocked down to a nominal purchaser, without his knowledge or consent, and that the certificates, though changed into his name, were never delivered to him, but were retained by the pledgee until after a subsequent sale pursuant to notice.

3. *Books of corporation as evidence.*—The books of the Stock Exchange, a private corporation, are not admissible as evidence of a sale of stock therein recorded, in a suit to which the corporation is not a party, on proof that the entries are in the handwriting of the secretary, who is alive and in the city, and whose absence as a witness is not accounted for.

4. *Same; declarations of agent, as evidence against principal.*—The books of the corporation are not admissible as evidence against the pledgor whose stock was sold, on the ground that his power of attorney had made the corporation his agent to sell, unless it is shown

[Terry v. Birmingham National Bank.]

. that the entries were made contemporaneously with the sale, or so
near as to come within the principle of *res gestæ*.

5. *Damages for conversion of stock.*—For an unauthorized sale of.
stock pledged as collateral security, amounting to a conversion, the
pledgor is entitled to recover as damages the market value of the
stock at the time of the sale, with interest to the day of the trial;
and the jury may, in their discretion, allow the highest market value
at any time between the sale and the trial.

APPEAL from the Circuit Court of Jefferson.

Tried before the Hon. JAMES B. HEAD.

This action was brought by the Birmingham National Bank
against R. J. Terry, and was founded on the defendant's prom-
issory note for $4,179.57, which was dated May 4th, 1888, and
payable on the 25th June, 1888, at the plaintiff bank, "to the
order of H. C. Ansley, cashier," he being the cashier of said
bank at that time; on which note were indorsed the following
credits: July 30th, 1889, $10; August 1st, 1888, $96.74;
December 10th, 1888, $2,225; November 13th, 1888, $127.67;
and the complaint acknowledged an additional credit, May
6th, 1889, of $132.69. The action was commenced on the
27th July, 1889. The defendant pleaded, 1st, a general denial
of the allegations of the complaint, and afterwards added
pleas numbered as follows: (1) payment; (2) set-off for
$5,000, the value of fifty shares of stock in the Edison Electric
Illuminating Company, alleged to have been sold by plaintiff
for use of the defendant, and converted to plaintiff's own use;
(3) failure of consideration, because said note was given in
payment of said shares of stock, and they were never delivered
to defendant; (4) recoupment for the value of said shares of
stock for which the note was given, because said shares were
held by plaintiff as collateral security, and were sold without
authority and converted by plaintiff to its own use. Another
plea was afterwards interposed, not numbered, alleging that
the note was without consideration. There was a demurrer
to the "2d and 4th pleas," which was overruled, and a replica-
tion to the "3d plea," to which a demurrer was overruled; and
the judgment-entry recites that "issue was joined on pleas
1, 2, 4, and 5, and the plaintiff's replication to plea No. 3."

On the trial, the plaintiff read in evidence the note on which
the suit was founded, and afterwards proved that it was given
by the defendant on the fourth or fifth extension of a note
dated in June, 1887, and payable in September, 1887, each
being payable to the order of the cashier of the plaintiff bank.
The defendant, testifying for himself, stated the circumstances
attending the execution of the first note, and the subsequent
notes given in extension, substantially as follows: In June,
1887, John W. Read was the president of the plaintiff bank,

and was also the secretary of a corporation called the "Edison Electric Light & Illuminating Company;" and defendant being in his office at the bank one day, he proposed to sell to defendant fifty shares of the stock of said corporation, at par. Defendant declined to buy the stock, because he had no money to spare, but agreed to buy ten shares, on Read's promise that the bank "would carry his demand paper for $1,000, at eight per cent., as long as he should desire." Read then proposed to sell defendant an option on forty shares, at par, for ninety days, giving him the privilege to take and pay for the stock at any time within the ninety days, or refuse to take it; and defendant agreed to accept the proposal. The witness then continued: "Read then made out a note for me to sign, for $4,000, or $4,000 with interest, payable to H. C. Ansley, cashier of said bank, or to the bank itself; but I declined to sign it. Read insisted that it was proper to give the note, so as to show, in case I should die, that I had not paid for stock; and he agreed to surrender the note to me, at the expiration of ninety days, if I did not take the stock. On these terms and conditions I signed the note, and left it with Read to hold in trust for me, until the expiration of the ninety days, at which time it was to be surrendered to me, or I was to take the stock and pay for it."

At this time the defendant was a stockholder and director of said bank, and being elected a member of the Finance Committee a few weeks afterwards, he found this note, with fifty shares of stock in said corporation attached, which included the ten shares he had bought, and for which he had given a separate note; and he testified that he then "told the committee that the note was improperly there, and explained to them the conditions and circumstances under which it was given." He testified, also, that he notified Read, before the expiration of the ninety days, that he would not take the stock; that Read was absent from Birmingham when the note fell due, and the note was presented to him by the bank cashier, for payment or renewal; that he at first declined to renew it, but finally did so to avoid protest, and on the statement of the cashier that the matter could be arranged with Read on his return. On the maturity of this note, the defendant being absent from the city, as he testified, it was renewed in his name by his brother, at the instance of the cashier; and when this note matured, it was renewed by himself, as he testified, to avoid a protest of it and another note, on which was an indorser whom he desired to protect.

Attached to each of these notes was the certificate for the fifty shares of stock, on which was a transfer signed in blank by

the defendant; but the evidence did not show when this transfer was signed, nor when or by whom the certificate was attached to the notes, except that the defendant testified it was so attached by Read. Ansley, the cashier of the bank, testified from the entries in the books, made by himself, that the first note was discounted in the name of the defendant, or for his benefit, and was marked *paid by renewal*. L. Carroll, the president of the Edison Electric Light & Illuminating Company, testified that the fifty shares of stock, originally Nos. 26 and 27, were issued to Terry by direction of Read, and were paid for by a cheque on the bank for $5,000, or that amount was entered to the credit of the company on the books of the bank, he was not certain which.

Read became largely indebted to the bank, and retired from the presidency; and afterwards, in February, 1888, on a settlement with defendant, he executed to the latter his promissory note for $5,000, secured by the transfer of collateral securities, and among them fifty shares of stock in said corporation. Defendant, being pressed for the payment or settlement of his indebtedness to the bank, of which R. D. Johnston had become the president, transferred these collateral securities to the bank, and the credits entered on his notes were for moneys realized from these collaterals. Defendant testified, also, that Johnston wanted him to indorse in blank the fifty shares of stock, and he did so in January, 1888; that Johnston also wanted him to sell the stock, but he declined to do so, because forty of the shares were not his, and Johnston would not separate the other ten shares from them; and that finally, in July, 1888, he gave Johnston a power of attorney, authorizing him to sell the stock through brokers on the Stock Exchange. At the sale of the stock under this power of attorney, it brought 44.5 cents on the dollar, and the proceeds of sale were entered as a credit on the note. There had been a former sale of the stock by the bank, without notice to the defendant; and the opinion states the material facts connected with that sale. There was evidence showing that Johnston had been offered 60 cents for the stock, and the defendant testified that it had been at par while held by the bank. The court admitted in evidence, in this connection, the books of the Stock Exchange, against the objection and exception of the defendant.

On all the evidence adduced, the court charged the jury as follows: "Under the power of sale given by the defendant to R. D. Johnston, said Johnston had the right to proceed and have the stock sold in the Stock Exchange, and it was his duty to do so. He was required by the power of sale to sell in the

[Terry v. Birmingham National Bonk.]

Stock Exchange, and it was therefore his duty to sell there, and not at private sale outside the Exchange. Plaintiff says it did sell the stock in the Exchange, according to the power of sale, and credited defendant's note with the proceeds. Defendant says that plaintiff did not sell according to the power of sale, but that it surrendered the certificates to the company which issued them, and took new certificates in the name of F. S. White, and that, if it sold any stock in the Exchange, it was the certificates which were in White's name. The court charges the jury, that if the new certificates were taken in White's name without his authority or knowledge, and without any understanding or agreement, express or implied, between plaintiff and White, that said White was to take or have any interest in the stock, and without any such understanding or agreement having ever arisen between them; and if such certificates all the while remained in plaintiff's possession, and were never delivered to White; and if Johnston, in the exercise of good faith and reasonable diligence, and in accordance with the power of sale, sold such stock in the Exchange, at its then reasonable value; then defendant is not entitled to a credit, or set-off, on account of said stock, for any greater sum than the stock sold for. Further, if the jury believe from the evidence that the stock was taken and disposed of as above hypothesized, then there was no wrongful conversion of the stock; and if there was a wrongful conversion of the stock by plaintiff, then a proper measure of the defendant's damages on account of said conversion would be the value of the stock at the time of the conversion, with interest thereon from the time of the conversion to the time it was applied as a credit on defendant's note; but the jury may, in their discretion, if they think the justice of the case requires it, give, in case of such wrongful conversion, the highest market value of the stock at any time between the conversion and the trial."

The defendant excepted to this charge as a whole, and to each part separately, and he also excepted to the following charge, which was given by the court at the instance of the plaintiff: "If the jury believe the evidence, they will find that the defendant is liable on the note sued on."

The defendant then requested the following charges in writing, and duly excepted to the refusal of each of them: (1.) "If the jury find that the plaintiff converted the defendant's stock, and that the value of said stock, with the dividends thereon added, amounts to more than the balance due on the note, the jury should say: 'We, the jury, find for the defendant against the plaintiff, and assess his damages at $——.'" (2.) "The purchase of Terry's stock by plaintiff, and having

the certificates for the same cancelled on the books of the E. E. Light & Illuminating Company, and re-issued to White, was a conversion of the stock by plaintiff." (3.) "The transfer of the R. J. Terry stock to F. S. White operated as a discharge of said stock from the pledge as collateral, and reinvested Terry with the right and title to said stock." (4.) "The evidence in the case fails to show that the defendant's stock was sold in accordance with the power of attorney given by him." (5.) "If the jury believe that plaintiff converted the defendant's stock, then they may charge defendant [*plaintiff?*] with the highest market price shown by the proof, and also the dividends shown by the proof, if any shown to have been paid on said stock, and this amount should be set off against the note; and if there is a balance over after paying the note, the verdict should be for the defendant." (6.) "The court charges the jury to find for the defendant, if they believe the evidence." (7.) "If the jury believe from the evidence that there was no consideration for the note sued on, they will find for the defendant."

The charges given and excepted to, the refusal of the charges asked, and the rulings on evidence shown by the opinion of the court, are assigned as error.

LANE & WHITE, for appellant.—(1.) The note was without consideration. The circumstances under which it was given, and the conditions annexed to it, were stated by the defendant, and his testimony was uncontradicted. No consideration passed as between him and Read, and the latter being the president of the bank, the bank was chargeable with notice of all the facts. The subsequent renewals of the note were each without consideration, and involved no element of estoppel, since the bank parted with nothing of value, and was not placed in a worse position. (2.) If the certificates of stock were legally transferred as collateral security for the note, their unauthorized sale by the bank operated a discharge of the debt.—Code, § 1784. The transfer of the shares to White, as shown by the evidence, rendered the stock liable to his debts.—Code, § 1671; *National Bank v. Pinckard*, 87 Ala. 577; *Winter v. Gas Light Co.*, 89 Ala. 544. Besides, the evidence shows that White asserted some interest in the stock, and declined to sell to a party who proposed to purchase, until he could consult his partner in interest; and that proposals to purchase the stock, as belonging to him, were made by other persons, and declined. The charge of the court excluded from the jury the credibility and effect of this evidence. (3.) The sale of the stock, without compliance with the terms

[Terry v. Birmingham National Bank.]

of the power of attorney, was a conversion, for which the defendant was entitled to recover as damages the highest market value of the stock at any time before the trial— *Ware v. Russell*, 57 Ala. 43; 14 Ala. 65; *Jenkins v. McConnico*, 26 Ala. 213; *Ewing v. Blount*, 20 Ala. 694. (4.) The books of the Stock Exchange were not competent evidence, without the suppletory oath of its secretary who made them.—1 Greenl. Ev. § 118, note 2; 1 Smith's L. C. 577; *Kaiser v. Alexander*, 144 Mass. 71; *Miller v. Shay*, 145 Mass. 162; *Little v. Wyatt*, 14 N. H. 23; 1 Rawle, 441; 1 Dall. 238; 5 Watts, 323; 8 Ohio, 494; 34 Wisc. 545; 12 Nebr. 42; 32 Tex. 229; *Bondurant v. Bank*, 7 Ala. 830; *Acklen v. Hickman*, 63 Ala. 494; *Hart v. Kendall*, 82 Ala. 144.

CABANISS & WEAKLEY, and MOUNTJOY & TOMLINSON, *contra*. (1.) If the original note was without consideration, the last two renewals were each supported by a valid consideration, namely, the extension of other debts. (2.) The defendant is estopped from denying his ownership of the stock, by his subsequent conduct and dealings with it. (3.) There was no conversion of the stock by the bank.—*Fay v. Gray*, 124 Mass. 500; *Day v. Holmes*, 103 Mass. 306; 39 Md. 314; *Heath v. Giswold*, 18 Blatch. 555, or 5 Fed. Rep. 573; *Adams v. Sturgess*, 55 Ill. 468; 39 Wisc. 146; Jones on Pledges, § 507; Code of Ala., § 1671. (4.) If there was a conversion, the court properly charged the jury as to the measure of damages. *Linam v. Reese*, 68 Ala. 89; *Brooks v. Hubbard*, 69 Ala. 379. (5.) The entries on the books of the Stock Exchange were properly admitted as evidence.—1 Greenl. Ev. §§ 120, 483-4; *Mer. Bank v. Rawls*, 50 Am. Dec. 394; 2 Whart. Ev. § 1131; *R. R. Co. v. McGuire*, 79 Ala. 398; 41 Amer. Dec. 545.

COLEMAN, J.—The assignments of error present no question which brings before us for consideration any ruling of the court upon the pleadings. The contention that the note sued upon was without consideration, or that it was given with the privilege to cancel the same within ninety days, is without merit. The proof shows that the Edison Electric Illuminating Company received from the bank the money for which the note was given, and in consideration thereof fifty shares of its stock was issued in the name of the defendant, E. J. Terry, and numbered 26 and 27, each for 25 shares. The first note was made in June, 1887, renewed and extended with the interest added, in September, 1887, and again in October, 1887, again in January, 1888, and again in April, and again in May, 1888, at which time the note sued upon was executed. The

certificates of stock were indorsed by R. J. Terry in blank, were attached to and pledged to the bank as collateral to secure the payment of the note, and afterwards other collaterals were pledged to further secure the payment of the note. In July, 1888, R. J. Terry in writing constituted and appointed R. D. Johnston, who was the president of the bank, his attorney, to sell through any stock-broker he might select on the Stock Exchange the fifty shares of stock pledged, the proceeds to be applied to the note. A mere statement of the facts is a sufficient answer to these two grounds of contention.

It is next contended that the pledgee was guilty of a conversion of the stock pledged. The pledgee, without notice to the pledgor, sold the stock hypothecated, and Frank S. White was reported as the purchaser. The original certificates, Nos. 26 and 27, were surrendered, and new certificates issued in the name of Frank S. White, numbered 89 and 90. These certificates were indorsed in blank by White, and remained in the possession of the bank. The proof showed that White never paid anything for the certificates, or claimed them; that his name was merely used by the bank as a convenience, in order to effect a sale of the stock, and that the bank was the real purchaser. After this sale the pledgee, learning that a sale of the pledge could not be legally made without notice to the pledgor, notified R. J. Terry in writing of the intention to sell the stock. The proof shows that the bank held the certificates of stock all the time they were in the name of White, and during this time it was in the power of the bank to return the stock to the pledgor, upon the payment of the note to secure which the stock was hypothecated.

In the case of *Day v. Holmes*, 103 Mass. 306, it was held, that where there was no contract of sale of the stock, no money or other consideration paid or agreed to be paid therefor by the transferree, and the stock was taken back by indorsement in blank from the transferree, so that the stock remained under the control of the pledgee, ready for delivery to the pledgor on payment of the note, there was no conversion; and the same rule was declared in *Fay v. Gray*, 124 Mass. 500. To constitute a conversion, there must be a tortious detention of the property from the owner, or its destruction, or the exclusion or defiance of the owner's right; or a withholding of the possession under a claim of title inconsistent with that of the owner.—*Conner & Johnson v. Allen*, 33 Ala. 516; *Thweatt v. Stamps*, 67 Ala. 98; *Penny v. State*, 88 Ala. 106.

The evidence shows that the pledgee recognized the stock to be that of Terry, subject to the hypothecation, although the

certificates were issued in the name of White. The notice given of the intended sale of the stock on the Stock Exchange was a recognition of the right of the pledgor. Whether these facts were proven or not, was properly left to the jury. The dealings of the bank in regard to the hypothecated certificates of stock, the credits entered on the note, were entered on the books of the bank. The evidence shows that the pledgor was a stockholder in the bank, a member of the Finance Committee, and a director at the time, and for some time after the hypothecation of the stock. We must presume he had access to the books, and knew the condition of his note and collaterals, at least so long as he held this relation to the bank.

There is no difficulty in tracing the stock originally issued by the Edison Electric Light Company in the name of R. J. Terry, to its present holder, Jas. H. Little. The stock-book of the company shows that numbers 26 and 27, of 25 shares each, were issued to R. J. Terry. The stock-book further shows that the certificates representing these numbers were returned and cancelled, and the same stock was re-issued to White as Nos. 89 and 90; that these were returned and cancelled, and re-issued as 101 and 102 to E. W. Rucker, and 101 and 102 cancelled, and re-issued to Jas. H. Little, the present holder, as 106 and 107.

The evidence tended to show that, between the hypothecation of the stock and the trial, the value of the stock varied from thirty cents to par, and defendant claimed as a set-off the highest market value. As evidence tending to show that the stock was sold on the Stock Exchange as directed by the power of attorney of the pledgor, and the date of the sale, and the price at which the stock was sold, the plaintiff introduced in evidence the books of the Stock Exchange, in which was recorded the sales. It was shown that Louis Frierson was the secretary of the company; that the entries were in his handwriting, and that he was alive and in the city; and no showing was made to account for his absence. It was testified that the book was the regular stock-book of sales; that it was correctly kept, and the entries in the handwriting of the secretary. Upon this proof, the books were admitted as evidence, against the objection of the defendant. The exception presents for decision the question of the admissibility of the books of a private corporation, as original evidence against third persons, upon such preliminary proof as was made in this case.

It has been declared that an exception to the general rule that the best evidence must be produced obtains in the case of public writings, as it would be improper to permit them to

[Terry v. Birmingham National Bank.]

be transported from place to place. The Bank of the State of Alabama and its branches are the property of the public, and there can be no doubt that its books are public writings, and are within the rule.—*Crawford v. Branch Bank*, 8 Ala. 80. Mr. Wharton says, bank-books are admissible as showing a *prima facie* case against the bank by whom the entries are made, and a party dealing with the bank, so far as he has made the person making the entries his agent. Entries made by strangers, however, without the knowledge of the litigants, can not be received as against either of the litigants. . Ordinarily, bank-books are not evidence in suits to which the bank is not a party, without proving such books by the clerk who made the entry, if within process, or proving his handwriting, if he is outside of process.—2 Wharton's Law. Ev. § 1131. At common law, the admissibility of the books of the corporation depended upon the nature of the acts recorded. If they were obviously of a public character, and the entries made by a proper officer, they will be received in evidence for or against the corporation.—2 Taylor on Ev., § 1781. But the author does not extend the rule to acts of a private character, where the corporation is not a party. In Morawetz on Private Corporations, § 40, it is said that the books of a corporation are admissible against the company and its members, only on the principle that they are admissions; they are not evidence against strangers. The same author declares that it is well settled that the stock-books are admissible as independent evidence to show who are the stockholders of a company; although he adds, "it is difficult to support it by any principle of common law."—*Ib.* §§ 75, 76. The "Stock Exchange" is a private corporation, and the weight of authority and the better rule is that the entries in its books, as independent evidence against third persons, must stand upon the same footing as entries made in the books of companies, partnerships and individuals.

In the case of the *Union Bank v. Knapp*, reported in 15 Amer. Dec., after reviewing many authorities, in a note on p. 195 the conclusion reached was declared to be, that original entries, made in the regular course of the business by a third person, and in some jurisdictions by the party in interest himself, are admissible in evidence, after his death, insanity, or absence from the State, upon proof of his handwriting. If the person who made the entries is alive, and within reach of the process of the court, he must be called to authenticate them. In the case of *Elliott v. Dycke*, 78 Ala. 157, it was held that, "when a witness is shown to be dead, or beyond the jurisdiction of the court, written entries and memorials of a transac-

[Terry v. Birmingham National Bank.]

tion entered in the usual course of business, and which are shown to be in the handwriting of the absent or deceased witness, and purport or are shown to have been made at or about the time of such alleged transaction, are admissible in evidence, in any issue involving the transaction to which they relate." The case of *Hancock v. Kelly*, 81 Ala. 378, is to the same effect.

It is insisted that R. J. Terry directed that the "Stock Exchange" should sell the stock, and for this purpose the "Stock Exchange" was his agent. The power of attorney of the pledgor, in which he directed that the stock should be sold by the "Stock Exchange," for the purposes of a sale, made the "Stock Exchange" his agent, and it is argued that Terry is bound by the entries in the stock-book, as admissions made by an agent. The only ground upon which the entries could be admissible as the declarations and admissions of an agent binding upon the principal is, that they were explanatory of some contemporaneous act within the scope of his authority, forming part of the *res gestæ*. It is well settled that the admissions of an agent, as to bygone transactions, do not bind his principal.—*Bradford v. Haggerty*, 11 Ala. 701; *Ala. Gt. So. R. R. v. Hawks*, 72 Ala. 117; 3 Brick. Dig. p. 25, §§ 107, 108; *Western Union Tel. Co. v. Way*, 83 Ala. 554. The declarations and admissions themselves are not competent as independent evidence, to prove they were made contemporaneously with the act, or to show they were *res gestæ*. This must be proven by evidence *aliunde*. The witness Embrey, by whom the preliminary proof in regard to the books was made, did not pretend to testify that he saw the entries made, or knew when they were made. His evidence on this point was, that he did not keep the books, but that Louis Frierson, the secretary, kept them. The proof showed that Louis Frierson was alive, and within the jurisdiction of the court, and his absence was not accounted for. The admission of the book was clearly erroneous.

The charge of the court in regard to the measure of damages is fully sustained by the authorities.—*Linam v. Reeves*, 68 Ala. 89; *Burke v. Hubbard*, 69 Ala. 384.

The rulings of the court as to the consideration and validity of the note, and the conversion of the stock by plaintiff, as embodied in the charges given and refused, applicable to the evidence before the jury, are in accord with the principles of law herein declared.

For the error in admitting in evidence the book of sales of the Stock Exchange Company, without first laying a sufficient predicate, the cause must be reversed.

Reversed and remanded.